# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SCOTT A. PRIDEMORE,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00021 |
| | ) | **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Scott A. Pridemore, ("Pridemore"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

Case 2:15-cv-00021-PMS   Document 14   Filed 03/16/17   Page 1 of 26   Pageid#: 1030

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pridemore protectively filed his applications for DIB and SSI[2] on May 24, 2006, alleging disability as of May 12, 2006,[3] due to back pain; arthritis; chronic obstructive pulmonary disease, ("COPD"); nerve loss in the legs and arms; carpal tunnel syndrome; slight hearing loss; depression; and anxiety. (Record, ("R."), at 118-20, 123-26, 141, 146, 181.) The claims were denied initially and upon reconsideration. (R. at 71-73, 78-80, 84-87, 89-90, 92-93, 95-96.) Pridemore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 97-98, 637-38.) The ALJ held a hearing on February 2, 2009, and by decision dated April 23, 2009, the ALJ denied Pridemore's claims. (R. at 24-64, 596-604.) This denial was appealed, and the Appeals Council denied Pridemore's

---

[2] Pridemore originally filed for DIB and SSI on September 3, 2004, alleging disability as of April 1, 2003. (R. at 580.) The claims were denied initially and on reconsideration. (R. at A580.) Pridemore requested a hearing before an ALJ, and the hearing was held on February 15, 2006. (R. at 580.) By decision dated May 11, 2006, the ALJ denied Pridemore's claims. (R. at 580-87.) Pridemore pursued his administrative appeals, but the Appeals Council denied his request for review. Pridemore then filed an action in this court seeking review of the decision denying benefits. By Opinion and Order entered October 2, 2007, in Case No. 2:06cv00076 this court affirmed the decision denying benefits.

[3] Pridemore amended the period of disability beginning May 12, 2006, to July 10, 2010, based on his incarceration that began in July 2010. (R. at 550.) Therefore, Pridemore is not seeking benefits after July 10, 2010.

request for review. (R. at 606-09.) Pridemore then filed an action in this court seeking review of the ALJ's unfavorable decision.

By Opinion and Order entered April 27, 2012, in Case No. 2:11cv00010, U.S. District Judge James P. Jones remanded Pridemore's claim to the Commissioner based on his finding that substantial evidence did not support the ALJ's finding that Pridemore did not suffer from a severe mental impairment. (R. at 610-32.) The Appeals Council remanded the case to the ALJ for further consideration. (R. at 633-35.) On remand, a video hearing was held before an ALJ on August 22, 2014. (R. at 545-66.)

By decision dated August 28, 2014, the ALJ denied Pridemore's claims. (R. at 521-36.) The ALJ found that Pridemore met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2007. (R. at 523.) The ALJ found that Pridemore had not engaged in substantial gainful activity since May 12, 2006, the alleged onset date.[4] (R. at 523.) The ALJ found that the medical evidence established that Pridemore had severe impairments, namely lumbago and cervicalgia; obstructive sleep apnea; COPD; hypertension; mild carpal tunnel syndrome; depression; and anxiety, but he found that Pridemore did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 524.) The ALJ found that Pridemore had the residual functional capacity to perform

---

[4] Therefore, Pridemore had to show that he was disabled between May 12, 2006, the alleged onset date, and September 30, 2007, the date last insured, in order to be eligible for DIB benefits.

simple, routine, repetitive, unskilled, light work[5] that did not require more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; that did not require more than occasional exposure to pulmonary irritants or interactions with the public, co-workers and supervisors; and that did not expose him to hazards. (R. at 526.) The ALJ found that Pridemore was unable to perform his past relevant work. (R. at 534.) Based on Pridemore's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Pridemore could perform, including jobs as an assembler, a mail clerk and a library shelving clerk. (R. at 534-35.) Thus, the ALJ concluded that Pridemore was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 535.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2016).

After the ALJ issued his decision, Pridemore pursued his administrative appeals, (R. at 513-16), but the Appeals Council denied his request for review. (R. at 506-08.) Pridemore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). This case is before this court on Pridemore's motion for summary judgment filed May 13, 2016, and the Commissioner's motion for summary judgment filed June 16, 2016.

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

## II. Facts

Pridemore was born in 1976, (R. at 118, 123), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Pridemore obtained his general education development, ("GED"), diploma and has special training in diesel mechanics. (R. at 151, 551.) Pridemore testified that he was arrested in 2009 for distribution of prescription medication. (R. at 553-54.) He stated that he worked while incarcerated by picking up trash along the road. (R. at 555.) Pridemore stated that he received no treatment after he was incarcerated. (R. at 550, 557.)

Asheley Wells, a vocational expert, also was present and testified at Pridemore's 2014 hearing. (R. at 561-65.) Wells was asked to consider a hypothetical individual of Pridemore's age, education and work history, who would be limited to simple, routine, repetitive, unskilled, light work that did not require him to work around hazardous machinery, unprotected heights or to climb ladders, ropes or scaffolds; that did not require more than occasional climbing, balancing, stooping, kneeling, crouching and crawling; and that did not require more than occasional exposure to pulmonary irritants or more than occasional interaction with co-workers, supervisors and the public. (R. at 562.) Wells stated that the individual could perform jobs existing in significant numbers in the national economy, including those of an assembler, a mail clerk, a packing line worker and a library shelving clerk. (R. at 562-63.) Wells stated that all competitive employment would be precluded if the individual would be off-task more than 10 percent of the time due to difficulties in maintaining concentration, persistence or pace. (R. at 564-65.)

In rendering his decision, the ALJ reviewed records from Norton Community Hospital; Dr. Gurcharan Kanwal, M.D.; Dr. Mohammed A. Bhatti, M.D.; Dr. Kevin Blackwell, D.O.; Dr. Uzma Ehtesham, M.D.; Lonesome Pine Hospital; Dr. Shirish Shahane, M.D., a state agency physician; B. Wayne Lanthorn, Ph.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Coeburn Hospital Clinic; Dr. Donald R. Williams, M.D., a state agency physician; Abingdon Orthopedic Associates, P.C.; Dr. Esther Adade, M.D.; Dr. Daryl Larke, M.D.; and Robert S. Spangler, Ed.D., a licensed psychologist.

The record shows that Pridemore sought treatment from Dr. G. S. Kanwal, M.D., from February 2005 through June 2008 for various complaints such as chest pain; shortness of breath; back pain; anxiety; depression; COPD; nicotine abuse; a mood disorder; GERD; and tendonitis. (R. at 250-61, 383-98, 474-78.) In February 2005, Pridemore complained of chest pain; shortness of breath; anxiety; and depression. (R. at 252.) Dr. Kanwal diagnosed chronic back pain, anxiety and a mood disorder. (R. at 252.) In March 2005, Pridemore reported that he was less anxious since taking Abilify. (R. at 253.) In November 2005, Pridemore complained of back pain, anxiety and depression. (R. at 250-51.)

On February 9, 2006, Pridemore reported that Abilify helped his symptoms of anxiety. (R. at 258.) That same day, Dr. Kanwal completed a medical assessment indicating that Pridemore could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 881-84.) He indicated that Pridemore could stand and/or walk less than two hours in an eight-hour workday. (R. at 881.) Dr. Kanwal indicated that

Pridemore must periodically alternate between sitting and standing. (R. at 882.) He indicated that Pridemore's ability to push and pull was limited, as was his ability to reach. (R. at 882-83.) He indicated that Pridemore should never climb, balance, kneel, crouch, crawl or stoop. (R. at 882.)

On June 26, 2006, Pridemore reported that he "stay[ed] panicky all the time." (R. at 259.) Dr. Kanwal diagnosed panic attacks. (R. at 259.) On October 4, 2006, Dr. Kanwal admitted Pridemore to Lonesome Pine Hospital for shortness of breath with a productive cough. (R. at 317-25, 389.) He was diagnosed with bronchial pneumonia, COPD and lumbar disc disease. (R. at 317.) On December 4, 2006, x-rays of Pridemore's thoracic spine showed mild osteopenia, and the T11 and T12 discs had a very slight wedged appearance. (R. at 397.) On December 12, 2006, Dr. Kanwal told Pridemore that he would not prescribe more pain medication, stating that Pridemore would need to find a pain management doctor. (R. at 385.) On January 3, 2007, Pridemore complained of back pain and stated that he was unable to find a pain management physician. (R. at 384.) In February and March 2007, x-rays of Pridemore's lumbar spine were normal. (R. at 393-95.) An MRI of Pridemore's lumbar spine performed in March 2007 showed mild multilevel disc desiccation. (R. at 391-92.) On December 17, 2007, Dr. Kanwal reported that Pridemore had marked tenderness in his back with decreased range of motion. (R. at 477.) In January 2008, a pulmonary examination revealed occasional rhonchi. (R. at 476.) Pridemore had tenderness in his back with decreased range of motion. (R. at 476.)

The record shows that Pridemore sought treatment from Dr. Mohammed A. Bhatti, M.D., a neurologist, from January 2004 through October 2006 for various complaints including back and neck pain, seizures and insomnia. (R. at 262-76,

294-300, 845-63.) On May 9, 2005, Pridemore reported one episode of passing out. (R. at 276.) He reported continued neck and back pain, but stated that he was much better with his then-current medication. (R. at 276.) On June 2, 2005, Pridemore reported that he was "doing alright." (R. at 275.) Although his EEG was abnormal, Dr. Bhatti noted that Pridemore was doing well on medication. (R. at 275.) He diagnosed complex partial seizure. (R. at 275.) On July 1, 2005, Pridemore reported that his neck and back pain was reasonably controlled with medication. (R. at 274.) On August 1, 2005, Pridemore reported that he was "doing okay." (R. at 273.) He stated that he had no further seizures. (R. at 273.) On September 1, 2005, Pridemore complained of back and knee pain after flipping a lawn mower on top of him. (R. at 272.) On December 15, 2005, Pridemore reported difficulty sleeping and back, leg and neck pain. (R. at 271.) He reported experiencing one seizure since his previous office visit. (R. at 271.)

On January 11, 2006, Pridemore reported one episode of passing out. (R. at 268.) He was diagnosed with complex partial seizures. (R. at 268.) On February 13, 2006, Pridemore complained of back and knee pain. (R. at 268.) His neurological examination was non-focal and unchanged. (R. at 268.) Dr. Bhatti reported that Pridemore had degenerative joint disease of the cervical and thoracic spine and arthritis of the knee. (R. at 268.) He noted that Pridemore's complex partial seizures were in remission. (R. at 268.) On March 13, 2006, Pridemore reported that he had not experienced any seizures since his previous office visit. (R. at 269.) He continued to complain of neck and back pain. (R. at 269.) Dr. Bhatti diagnosed cervical radiculopathy and lumbar spine radiculopathy. (R. at 269.) On May 19, 2006, Pridemore complained of a lack of sleep and back pain. (R. at 267.) He reported no seizures. (R. at 267.) His neurological examination was non-focal and unchanged. (R. at 267.) Dr. Bhatti noted that Pridemore's sleep

study showed mild sleep apnea; however, Pridemore refused treatment. (R. at 263-67.) Dr. Bhatti recommended referral to a psychiatrist, but Pridemore refused to see one. (R. at 267.) On July 21, 2006,[6] Pridemore reported that he fell when his knees "bulked in front of him," causing him to injure his hand and left knee. (R. at 295.) Dr. Bhatti recommended that Pridemore have his potassium and phosphate levels checked the next time he experienced an episode of his knees bulking under him. (R. at 295.) On August 21, 2006, Pridemore stated that he had not experienced further seizures. (R. at 294.) On September 7, 2006, x-rays of Pridemore's lumbar spine were normal. (R. at 308.) X-rays of Pridemore's chest also were normal and showed clear lungs with no gross bony abnormality. (R. at 309.) In October 2006, Pridemore saw Dr. Bhatti for complaints of neck and back pain. (R. at 845.) Pridemore reported that he had not had any seizures. (R. at 845.) Pridemore's neurology examination was non-focal and unchanged. (R. at 845.) Dr. Bhatti noted that a nerve conduction study suggested cervical radiculopathy, but that more imaging was recommended. (R. at 360, 845.) Dr. Bhatti also continued to treat Pridemore for complex partial seizures. (R. at 845.) X-rays of Pridemore's thoracic spine in December 2006 showed mild osteopenia and a very slight wedged appearance at T11 and T12, suggestive of possible past trauma. (R. at 397.)

On October 17, 2005, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Pridemore at the request of Pridemore's attorney. (R. at 870-74.) Pridemore demonstrated good concentration and was appropriately persistent on tasks. (R. at 870.) Spangler reported that Pridemore was alert and oriented; he had

---

[6] On July 21, 2006, Pridemore visited the emergency room at Norton Community Hospital complaining of falling on his right arm/wrist/hand. (R. at 280.) Pridemore had a normal neck and chest examination. (R. at 281.) X-rays of Pridemore's right wrist and hand showed a fracture at the distal fifth metacarpal. (R. at 277-78.) Pridemore was placed in a wrist splint. (R. at 285.)

adequate recall of remote and recent events; his affect was full range; his mood was euthymic; and he was cooperative, compliant and forthcoming. (R. at 872.) Spangler reported that Pridemore's social skills were adequate and that he had the judgment necessary to handle his own financial affairs. (R. at 873.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, and Pridemore obtained a verbal IQ score of 91, a performance IQ score of 95 and a full-scale IQ score of 93. (R. at 873.) Spangler diagnosed nicotine dependence and borderline personality disorder. (R. at 873-74.) Spangler assessed Pridemore's then-current Global Assessment of Functioning, ("GAF"),[7] score at 75.[8] (R. at 874.)

Spangler completed a mental assessment, indicating that Pridemore had an unlimited ability to follow work rules and to understand, remember and carry out simple job instructions. (R. at 877-79.) He indicated that Pridemore had a limited, but satisfactory, ability to interact with supervisors; to deal with work stresses; to function independently; to maintain attention/concentration; and to understand, remember and carry out detailed instructions. (R. at 877-78.) Spangler indicated that Pridemore had a limited, but satisfactory, ability to a seriously limited, but not precluded, ability to maintain personal appearance and to behave in an emotionally stable manner. (R. at 878.) He indicated that Pridemore had a seriously limited, but not precluded, ability to relate to co-workers; to deal with the public; to use

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors ...; no more than slight impairment in social, occupational, or school functioning...." DSM-IV at 32.

judgment; to understand, remember and carry out complex instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 877-78.) Spangler stated that these limitations were a result of Pridemore's personality disorder and his complaints of chronic fatigue. (R. at 877-78.)

Pridemore saw Dr. Uzma Ehtesham, M.D., a psychiatrist, on June 28, 2006, upon Dr. Bhatti's referral. (R. at 305-06.) He reported paranoia; anger; irritability; panic attacks; and becoming violent at times. (R. at 305.) Pridemore was alert and oriented, and Dr. Ehtesham found his mood to be sad with a restricted affect. (R. at 305.) Dr. Ehtesham further found that Pridemore had paranoid ideations and decreased memory and concentration. (R. at 306.) She diagnosed major depressive disorder with the need to rule out bipolar disorder. (R. at 306.) She assessed Pridemore's then-current GAF score at 60.[9] (R. at 306.) Pridemore returned to Dr. Ehtesham on July 13, 2006, reporting increased grouchiness and depression, as well as worsened mood swings and anxiety. (R. at 304.) Mental status examination was unremarkable. (R. at 304.) On August 7, 2006, Pridemore again reported that his depression and anger were worse, and he was having a lot of problems with panic. (R. at 303.) His mood was fair with a congruent affect. (R. at 303.)

On August 16, 2006, Dr. Ehtesham completed a mental assessment, indicating that Pridemore was markedly[10] limited in his abilities to understand, remember and carry out short, simple instructions; to understand and remember detailed instructions; and to interact appropriately with the public and supervisors.

---

[9] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …"  DSM-IV at 32.

[10] A marked limitation is defined on this mental assessment as one indicating serious limitation with a severely limited, but not precluded, ability to function.  (R. at 837.)

(R. at 837-39.) Dr. Ehtesham further opined that Pridemore was extremely[11] limited in his abilities to carry out detailed instructions; to make judgments on simple work-related decisions; to interact appropriately with co-workers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. (R. at 837-38.)

On September 6, 2006, Pridemore continued to report racing thoughts at times, more frequent panic attacks and difficulty with memory and concentration. (R. at 302.) Dr. Ehtesham increased Pridemore's medication dosages. (R. at 302.) On October 3, 2006, Pridemore stated that his depression was improving, but his sleep remained decreased due to multiple stressors. (R. at 473.) He stated that his anger was not improving, and his mind continued to race. (R. at 473.) However, Pridemore reported that he was not taking his medications. (R. at 473.) His mood was fair with a congruent affect. (R. at 473.) On November 8, 2006, Pridemore stated that his anger was less of a problem, and his depression was worse. (R. at 472.) His mood was fair with a congruent affect. (R. at 472.) On December 6, 2006, Pridemore reported continued decreased sleep. (R. at 471.) His depression was stable and anxiety was fair, but his anger was worsened. (R. at 471.) Dr. Ehtesham saw Pridemore from January to April 2007. (R. at 468-70.) She reported that Pridemore had an anxious and irritable mood; depressed affect; intact memory; unremarkable thought content; linear thought process; and normal judgment. (R. at 468-69.)

---

[11] An extreme limitation is defined on this mental assessment as a major limitation with no useful ability to function in the given area. (R. at 837.)

On October 26, 2007, Dr. Ehtesham completed a mental assessment, indicating that Pridemore was markedly[12] limited in his abilities to understand and remember simple instructions and to interact appropriately with the public. (R. at 465-67.) Dr. Ehtesham further opined that Pridemore was extremely[13] limited in his abilities to carry out simple instructions; to make judgments on simple work-related decisions; to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with supervisors; to interact appropriately with co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 465-66.) Dr. Ehtesham stated that Pridemore had depression and anxiety, but that her information was not up to date because she had not seen Pridemore for several months. (R. at 465-66.)

On September 21, 2008, Dr. Ehtesham completed a mental assessment, indicating that Pridemore was markedly[14] limited in his abilities to understand, remember and carry out short, simple instructions; to understand, remember and carry out detailed instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors and co-workers; and to respond appropriately to work pressures in a usual work setting. (R. at 841-

---

[12] A marked limitation is defined on this mental assessment as one indicating serious limitation and a substantial loss in the ability to effectively function, resulting in unsatisfactory work performance. (R. at 465.)

[13] An extreme limitation is defined on this assessment the same as provided on Dr. Ehtesham's August 16, 2006, assessment. (R. at 465.)

[14] A marked limitation is defined on this mental assessment the same as provided on Dr. Ehtesham's August 16, 2006, assessment. (R. at 841.)

43.) Dr. Ehtesham further opined that Pridemore was extremely[15] limited in his ability to respond appropriately to changes in a routine work setting. (R. at 842.)

On January 26, 2009, Dr. Ehtesham reported that Pridemore was alert and oriented; he had good hygiene and grooming; he maintained eye contact; he had an anxious affect and congruent mood; and intact judgment. (R. at 500.) She diagnosed major depressive disorder and generalized anxiety disorder. (R. at 502.) Dr. Ehtesham assessed Pridemore's then-current GAF score at 60. (R. at 502.) On February 6, 2009, Dr. Ehtesham completed a mental assessment, indicating that Pridemore was markedly[16] limited in his abilities to understand and remember simple instructions; to understand and remember complex instructions; and to interact appropriately with the public. (R. at 503-05.) Dr. Ehtesham further found that Pridemore was extremely limited, meaning he had no useful ability to function, in his abilities to carry out simple instructions; to make judgments on simple work-related decisions; to carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with supervisors; to interact appropriately with co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 503-04.) In support of these findings, Dr. Ehtesham stated that Pridemore had extreme anger and mood swings, as well as severe panic attacks. (R. at 503-04.) She opined that Pridemore was permanently disabled. (R. at 505.)

---

[15] An extreme limitation is defined on this assessment the same as provided on Dr. Ehtesham's two previous mental assessments of Pridemore. (R. at 841.)

[16] A marked limitation is defined on this assessment the same as provided on Dr. Ehtesham's October 26, 2007, assessment. (R. at 503.)

From July to September 2006, Pridemore visited Dr. Daryl Larke, M.D., an orthopedist, complaining of a right hand injury and numbness in both hands. (R. at 311-14.) On examination, Dr. Larke noted that Pridemore had minimal to moderate swelling, but good alignment in his fingers. (R. at 312-14.) In September 2006, Dr. Larke noted that Pridemore had a mildly positive Tinel's sign at the elbow and the wrist, Phalen's sign was essentially negative, and he had no major thenar atrophy. (R. at 311.) Dr. Larke noted that Pridemore had stiffness in his right hand secondary to lack of home rehabilitation. (R. at 311.) Dr. Larke diagnosed Pridemore with a healing fifth metacarpal fracture, peripheral neuropathy of the hand and arm, right greater than left, and possible carpal tunnel syndrome versus ulnar neuropathy or both. (R. at 311.) In October 2006, Pridemore underwent an electromyogram, ("EMG"), and nerve conduction study that showed normal sensory and motor conduction studies of bilateral median and ulnar nerves without evidence of significant lesion, but he did have abnormal electromyographic findings, primarily in the cervical paraspinal muscles, suggestive of bilateral cervical radiculopathy. (R. at 360.)

On August 15, 2006, Dr. Kevin Blackwell, D.O., examined Pridemore at the request of Disability Determination Services. (R. at 290-93.) Dr. Blackwell reported that Pridemore was in no acute distress, and he was alert and oriented with a good mental status. (R. at 292.) Pridemore's gait was symmetrical and balanced; his shoulder and iliac crest heights were good and equal bilaterally; his upper and lower joint examination showed no effusion or obvious deformity other than the right hand, which showed a fracture over the fifth metacarpal; grip strength was somewhat diminished on the right due to pain; fine motor movement skills of both hands were normal; and upper and lower reflexes were good and equal bilaterally. (R. at 292.) Dr. Blackwell reported that Pridemore was limited to maximally lifting

items weighing 50 pounds and frequently lifting items weighing 20 pounds. (R. at 293.) He reported that Pridemore was limited to bending, stooping, squatting and kneeling two-thirds of the day or less; he was limited to no repetitive stair step and greater than four flights of stairs without rest due to his history of COPD; he was capable of standing four hours in an eight-hour workday; and he could sit for eight hours in an eight-hour workday, assuming normal positional changes. (R. at 293.)

On November 2, 2006, Dr. Shirish Shahane, M.D., a state agency physician, completed a medical assessment, indicating that Pridemore had the residual functional capacity to perform light work. (R. at 326-30.) He opined that Pridemore could occasionally use ramps; climb stairs, ladders, ropes and scaffolds; stoop; kneel; crouch; and crawl, and frequently balance. (R. at 328.) No manipulative, visual or communicative limitations were noted. (R. at 328-29.) Dr. Shahane opined that Pridemore should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 329.)

On December 5, 2006, Pridemore saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, at the request of Disability Determination Services. (R. at 333-38.) Lanthorn noted that Pridemore was fully oriented with a decidedly blunt affect and overall depressed mood. (R. at 333, 335.) He exhibited no signs of delusional thinking or any frank symptoms of ongoing psychotic processes. (R. at 335.) Pridemore reported that he struggled with transient suicidal ideation with no firm plan or intent. (R. at 336.) Lanthorn diagnosed Pridemore with major depressive disorder, recurrent, severe; pain disorder, associated with both psychological factors and general medical conditions, chronic; anxiety disorder with both generalized anxiety and panic attacks likely due to chronic physical

problems, pain; and he placed his then-current GAF score at 50.[17] (R. at 337.) He considered Pridemore's prognosis guarded. (R. at 337.) Lanthorn concluded that it was "difficult to imagine … Pridemore functioning in any job requiring a 40-hour workweek, even with simple and repetitive tasks." (R. at 337.) He strongly encouraged Pridemore to continue receiving psychiatric care. (R. at 337-38.)

On December 11, 2006, Dr. Frank M. Johnson, M.D., a state agency physician, completed a medical assessment, indicating that Pridemore had the residual functional capacity to perform light work. (R. at 339-43.) He opined that Pridemore could occasionally use ramps; climb stairs, ladders, ropes and scaffolds; stoop; kneel; crouch; and crawl, and frequently balance. (R. at 341.) No manipulative, visual or communicative limitations were noted. (R. at 341-42.) Dr. Johnson opined that Pridemore should avoid even moderate exposure to hazards, such as machinery and heights. (R. at 342.)

On January 11, 2007, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Pridemore suffered from an affective disorder and an anxiety-related disorder and that a residual functional capacity assessment was necessary. (R. at 363-78.) Jennings found that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning, experienced marked difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 374.) Jennings deemed Pridemore's allegations partially credible. (R. at 378.)

---

[17] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning.…" DSM-IV at 32.

Jennings also completed a mental assessment, indicating that Pridemore was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 380-82.) In all other areas, Pridemore was found to be not significantly limited. (R. at 380-81.) Jennings opined that the limitations resulting from Pridemore's impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (R. at 382.) She noted that Pridemore's pain appeared to be contributing to his mental condition, but his psychological symptoms alone would restrict him to simple, unskilled work. (R. at 382.)

On January 17, 2007, Lanthorn completed a mental assessment, indicating that Pridemore had mild limitations in his ability to understand, remember and carry out short, simple instructions. (R. at 864-66.) He found that Pridemore had a severely limited, but not precluded, ability to understand, remember and carry out detailed instructions; to make judgments on simple work-related decisions; to interact appropriately with the public, supervisors and co-workers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. (R. at 864-65.)

On July 31, 2007, Dr. Donald R. Williams, M.D., a state agency physician, completed a medical assessment, indicating that Pridemore had the residual functional capacity to perform light work. (R. at 439-44.) He opined that Pridemore could occasionally use ramps and climb stairs, ladders, ropes and scaffolds; stoop; kneel; crouch; and crawl and frequently balance. (R. at 441.) No manipulative, visual or communicative limitations were noted. (R. at 441.) Dr. Williams opined that Pridemore should avoid moderate exposure to hazards, such as machinery and heights. (R. at 441.)

On August 1, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding that Pridemore suffered from an affective disorder and an anxiety-related disorder and that a residual functional capacity assessment was necessary. (R. at 445-60.) Leizer found that Pridemore was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning, experienced marked difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 456.) Leizer deemed Pridemore's allegations partially credible. (R. at 460.)

Leizer also completed a mental assessment, indicating that Pridemore was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to travel in unfamiliar places or use

public transportation; and to set realistic goals or make plans independently of others. (R. at 462-64.) In all other areas, Pridemore was found to be not significantly limited. (R. at 462-63.) Leizer opined that the limitations resulting from Pridemore's impairments did not preclude him from meeting the basic mental demands of competitive work on a sustained basis. (R. at 464.) He noted that Pridemore's pain appeared to be contributing to his mental condition, but his psychological symptoms alone would restrict him to simple, unskilled work. (R. at 464.)

By letter dated June 13, 2008, Christy M. McGhee, M.S.N., F.N.P., and Dr. Melvin L. Heiman, M.D., reported that they saw Pridemore for an injury to his left shoulder. (R. at 479.) Pridemore reported that on June 5, 2008, he was jumping off of the high dive at the swimming pool and fractured his left shoulder.[18] (R. at 479.) Pridemore was advised to not lift or use his arm overhead. (R. at 479.)

On January 11, 2012, Dr. Esther F. Adade, M.D., saw Pridemore for complaints of allergies. (R. at 918-21.) Dr. Adade noted that Pridemore had normal thought content and perception; cognitive function; coordination; mood and affect; judgment and insight; and speech. (R. at 920.)

On July 31, 2014, Kathy J. Miller, M.Ed., a licensed psychological examiner, and Spangler evaluated Pridemore at the request of Disability Determination Services. (R. at 934-37.) Pridemore reported that he experienced panic attacks two years prior to being incarcerated. (R. at 935.) He stated that he

---

[18] On June 6, 2008, Pridemore presented to the emergency room at Lonesome Pine Hospital following a left shoulder injury sustained from jumping off a diving board. (R. at 484-86.) X-rays of Pridemore's left shoulder revealed a nondisplaced fracture of the left humerus. (R. at 486.)

was prescribed Valium, which stopped the panic attacks. (R. at 935.) He reported that he occasionally experienced panic attacks. (R. at 935.) Miller and Spangler reported that Pridemore was alert and oriented; his mood and affect were normal; no signs of depression or anxiety were noted; he was pleasant and cooperative; his speech was normal; he maintained good eye contact; his concentration and memory were adequate; his social skills were adequate; and he communicated in a clear coherent manner. (R. at 936.) Miller and Spangler diagnosed Pridemore with a mild panic disorder and noted that his function appeared stable. (R. at 936-37.)

That same day, Miller and Spangler completed a mental assessment, indicating that Pridemore had no impairments related to his ability to understand, remember and carry out instructions. (R. at 938-40.) They opined that Pridemore had mild limitations in his abilities to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 938-39.)

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is

not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir.

1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Pridemore argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-8.) In particular, Pridemore argues that the ALJ erred by rejecting the assessments of Dr. Kanwal, Dr. Ehtesham and Lanthorn. (Plaintiff's Brief at 6-8.)

I find Pridemore's argument that the ALJ erred by giving little weight to the assessments of Dr. Kanwal, Dr. Ehtesham and Lanthorn unpersuasive. (Plaintiff's Brief at 6-8.) As to Dr. Kanwal's opinion, the ALJ explained that his opinion was inconsistent with imaging that showed, at most, only mild multilevel disc desiccation that would not account for the limitations opined by Dr. Kanwal. (R. at 308, 391-92, 395, 397, 528, 897-98, 902-03.). Further, as the ALJ discussed, a consultative examination by Dr. Blackwell, performed seven months after Dr. Kanwal's opinion, supported far greater abilities. (R. at 528.) In particular, Dr. Blackwell's examination findings that Pridemore did not appear to be in any acute distress; he was alert, cooperative, and oriented to person, place, and time with "good mental status;" his lungs were clear to auscultation with no wheezing, rales, or rhonchi noted; he had a symmetrical and balanced gait; he had good grip strength and fine motor movement skills; and he had good upper and lower reflexes, and an otherwise normal examination of his upper and lower joints except

that he had a right hand fracture and decreased flexion in the lumbar spine, were inconsistent with the limitations imposed by Dr. Kanwal. (R. at 289, 292, 528-29.) The limitations imposed by Dr. Kanwal also are inconsistent with Pridemore's work detail while incarcerated. (R. at 529, 555.) Thus, I find that substantial evidence supports the ALJ's evaluation of Dr. Kanwal's opinion.

The ALJ noted that he was giving the marked and extreme limitations imposed by Dr. Ehtesham little weight because they were inconsistent with Dr. Ehtesham's treatment notes where she frequently assessed Pridemore's GAF score as 60, which was indicative of moderate symptoms or moderate difficulty in social or occupational functioning. (R. 306, 502, 530, 532-33.) *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (explaining that the weight an opinion receives depends on the degree a physician presents relevant evidence "particularly medical signs and laboratory findings" as well as its consistency with the record as a whole); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (explaining that objective medical evidence is a "useful indicator to assist [the agency] in making reasonable conclusions about the intensity and persistence" of a claimant's symptoms). In addition, as the ALJ noted, Dr. Ehtesham's own examination findings confirm that Pridemore had intact sensorium and memory; normal speech; unremarkable thought content; linear thought process; no suicidal ideation; and normal judgment. (R. at 303-04, 468-73.) The ALJ noted that two state agency psychologists opined that Pridemore was capable of performing simple, unskilled work, and the ALJ properly gave these opinions great weight. (R. at 382, 464, 533-34.) *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). In addition, as the ALJ explained, in Pridemore's most recent psychological consultative examination in 2014, the examiners found no limitations on his ability to understand, remember, and carry out instructions, with only mild limitations in his ability to interact appropriately

with the public, co-workers, and supervisors. (R. at 533, 938-39.) Furthermore, Pridemore reported that his symptoms improved with medication. (R. at 253, 258, 471, 473.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Therefore, I find that substantial evidence supports the ALJ's evaluation of Dr. Ehtesham's opinions.

The ALJ also noted that he was giving little weight to Lanthorn's opinion that Pridemore could not perform even simple, repetitive tasks because it was inconsistent with his opinion a month later that Pridemore had only slight difficulty understanding, remembering, and carrying out short, simple instructions. (R. at 531, 533, 864.) *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). The ALJ also found this opinion was inconsistent with Lanthorn's examination notes that show that Pridemore was oriented to person, time, and place; exhibited clear and intelligible speech; was able to perform serial 7's correctly; and exhibited no signs of delusional thinking or symptoms of ongoing psychotic processes. (R. at 335, 531.) Thus, I find that substantial evidence supports the ALJ's evaluation of Lanthorn's opinion.

The ALJ noted that the July 2014 evaluation performed by Miller and Spangler showed that Pridemore was alert and oriented; his mood and affect were normal; no signs of depression or anxiety were noted; he was pleasant and cooperative; his speech was normal; he maintained good eye contact; his concentration and memory were adequate; his social skills were adequate; and he communicated in a clear coherent manner. (R. at 936.) Miller and Spangler diagnosed Pridemore with only a mild panic disorder and noted that his function appeared stable. (R. at 936-37.) They opined that Pridemore had no impairments

Case 2:15-cv-00021-PMS   Document 14   Filed 03/16/17   Page 25 of 26   Pageid#: 1054

related to his ability to understand, remember and carry out instructions and that he had only mild limitations in his abilities to interact appropriately with the public, supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 938-39.)

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding as to Pridemore's residual functional capacity, and I find that substantial evidence exists to support the ALJ's conclusion that Pridemore was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     March 16, 2017.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE